UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARNOLD PRITT and RUTH ANN PRITT,

                          Plaintiffs,

                -v.-

AIR & LIQUID SYSTEMS CORPORATION
and GENERAL ELECTRIC COMPANY,

                          Defendants.

19 Civ. 10651 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Arnold Pritt alleges that he contracted mesothelioma after being exposed to asbestos both during his service in the U.S. Navy and over the course of his career as a civilian electrician. Plaintiff and his wife, Ruth Ann Pritt (together, "Plaintiffs"),[1] bring claims against Defendants Air & Liquid Systems Corporation ("Air & Liquid") and General Electric Company ("GE"), alleging that the two companies designed and manufactured products containing asbestos that caused Plaintiff's cancer.[2] GE now moves (i) to preclude the testimony of two of Plaintiffs' expert witnesses under various provisions of the Federal Rules of Evidence; and (ii) for summary judgment as to all claims asserted against it pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court denies GE's motion to preclude one of

---

[1]     References in this Opinion to "Plaintiffs" in the plural refer to Mr. and Mrs. Pritt, and to "Plaintiff" in the singular refer to Mr. Pritt.

[2]     Initially, Plaintiffs brought related claims against several other companies allegedly involved in the manufacturing of products that exposed Plaintiff to asbestos, including ViacomCBS Inc. (successor by merger to CBS Corporation, formerly known as Westinghouse Electric Corp.) ("Westinghouse"); Crane Co. ("Crane"); Foster Wheeler, L.L.C. ("Foster Wheeler"); and John Crane, Inc. ("JCI"). Since filing the case, Plaintiffs have settled with all Defendants except for Air & Liquid and GE.

Plaintiffs' experts and finds the motion regarding the admissibility of the other

expert to be moot.  Further, the Court grants in part and denies in part GE's

motion for summary judgment.

## BACKGROUND[3]

### A.   Factual Background

Plaintiff was diagnosed with mesothelioma in September 2019.  (Pl. 56.1

Response ¶ 11).  The parties dispute whether exposure to GE's products

caused Plaintiff to contract the disease.  Plaintiff alleges that he was exposed to

asbestos contained in and released from certain products manufactured by GE

while he served in the Navy and over the course of his career as a union

---

[3]     The facts set forth in this Opinion are drawn from the parties' submissions in connection with GE's motion for summary judgment, including GE's statement of undisputed material facts pursuant to S.D.N.Y. Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #111)); Plaintiffs' Rule 56.1 responses thereto ("Pl. 56.1 Response" (Dkt. #131)); Plaintiffs' Rule 56.1 Counterstatement ("Pl. 56.1" (Dkt. #131)); and GE's Rule 56.1 responses thereto ("Def. 56.1 Reply" (Dkt. #136)).  The Court also draws from the declarations submitted by the parties and the exhibits thereto, which declarations are cited using the convention "[Name] Decl."

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party.").  Additionally, to the extent that either party purports to dispute facts in the other's Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.  *See id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the parties' briefs in connection with GE's motion for summary judgment are referred to as "Def. Br." (Dkt. #112); "Pl. Opp." (Dkt. #130); "Def. Reply (Dkt. #133); "Pl. Surreply" (Dkt. #145); and "Def. Response" (Dkt. #146).  Similarly, the parties' briefs in connection with GE's motion to exclude the testimony of Dr. Candace Su-Jung Tsai are referred to as "Def. Tsai Br." (Dkt. #91); "Pl. Tsai Opp." (Dkt. #108); and "Def. Tsai Reply" (Dkt. #122).

electrician.  GE, for its part, maintains that it did not manufacture the equipment to which Plaintiff was exposed in the Navy and that he has not shown that the GE equipment with which he worked as an electrician caused his disease.  In the following subsections, the Court summarizes the record evidence of Plaintiff's activities during these two phases of his career.

### 1.     Plaintiff's Naval Service

Plaintiff enlisted in the U.S. Navy on June 6, 1961.  (Def. 56.1 ¶ 2). Following basic training and additional schooling (*id.* at ¶¶ 20, 22), he was assigned to serve on the USS *Purdy* (*id.* at ¶ 23), a Sumner-class destroyer (*id.* at ¶ 15).  Plaintiff began his work on the *Purdy* in the mess hall, but was assigned six weeks later to work in the ship's forward engine room, first as a fireman and later as a machinist's mate.  (*Id.* at ¶ 24).  Except for certain limited periods spent at training schools, Plaintiff worked consistently in the *Purdy*'s front engine room until he retired from the Navy three years later.  (*Id.* at ¶ 25).

The parties contest whether Plaintiff's service aboard the *Purdy* exposed him to asbestos-containing equipment that was manufactured by GE.  Plaintiff observes in the first instance that he encountered numerous pieces of equipment on the *Purdy* that contained asbestos, including pumps, valves, gaskets, packing, insulation, steam pipes, steam traps, and ship service turbine generators ("SSTGs").  (Pl. 56.1 ¶¶ 175-200).  The ship's SSTGs are essential to Plaintiff's claims against GE, as he alleges that they were a substantial source of his asbestos exposure.  (*Id.* at ¶¶ 175-188).  SSTGs, as

their name suggests, comprise two primary components: a turbine and a generator.  According to Plaintiff, Westinghouse manufactured the turbine component of the *Purdy*'s SSTG but GE manufactured the generator component.  (Pl. 56.1 Response ¶ 18).  Plaintiff further asserted that his station on the *Purdy* put him in close proximity to one of the ship's SSTGs, such that he would breathe in the dust that was released into the air from his crewmates' periodic maintenance work on that SSTG.  (Pl. 56.1 ¶¶ 175-188).

Plaintiff cited specific examples of work performed on the *Purdy* that exposed him to asbestos dust.  For example, Plaintiff testified that his crewmates "periodically" removed the SSTG turbine's lagging cover, "releasing asbestos dust" that he then breathed in.  (Pl. 56.1 ¶ 178; Pl. Dep. III 571:17-572:12).[4]  Similarly, Plaintiff observed his crewmates replace the turbine's gaskets once or twice a year, a process that required the crew to "scrape the SSTG flanges clean, then usually wire-brush them," which also released dust that Plaintiff then inhaled.  (Pl. 56.1 ¶¶ 179, 181-182).  Finally, Plaintiff testified that he "occasionally" was present when electricians worked on the SSTG's generator.  (Pl. Dep. III 413:17-414:1; *see also* Pl. 56.1 ¶ 186).  Of note, Plaintiff initially stated during his deposition that the electricians disturbed asbestos dust during this process (Pl. Dep. III 418:18-21), but later clarified that it was in fact carbon dust released from carbon brushes used to clean the generator (*id.* at 419:5-22), and that the electricians' work did not, in fact,

---

[4]     Plaintiff's deposition testimony is divided into three volumes.  *See* Vega Decl., Ex. 7 ("Pl. Dep. I"); *id.*, Ex. 8 ("Pl. Dep. II"); *id.*, Ex. 9 ("Pl. Dep. III").

involve the use or disturbance of asbestos-containing materials (*id.* at 419:23-420:2).

In addition to SSTG maintenance work, Plaintiff also identified several other sources of potential asbestos exposure on the *Purdy*.  As one example, Plaintiff testified that he was exposed to asbestos that had accumulated in the front engine room whenever the ship would fire its guns.  (Pl. Dep. III 566:4-22).  Plaintiff further testified that he was exposed to asbestos while the *Purdy* was docked for maintenance at the Brooklyn Naval Shipyard.  (Pl. 56.1 ¶ 195).  Plaintiff explained that while the ship was docked, he was assigned to stand watch as electricians worked on the ship's electrical equipment.  (*Id.* at ¶ 198).  Plaintiff testified that the drilling, vibration, and manipulation of the Bakelite — a type of plastic that can be used to encase asbestos — by others at the shipyard released asbestos into the air, which he then inhaled.  (*Id.* at ¶¶ 198-200).[5]  Finally, beyond these specific instances of exposure, Plaintiff claims that his exposure was made worse by virtue of the working environment maintained by the Navy.  In particular, Plaintiff testified that because Navy officers and sailors are "obsessed with cleanliness," he was tasked with sweeping the forward engine room almost daily, which actions stirred additional asbestos dust into the air.  (*Id.* at ¶ 196).

---

[5]     "Bakelite is both a generic term and a brand, and the general purpose Bakelite product contained asbestos until at least 1974."  (Pl. 56.1 ¶ 205).  Plaintiff states that "GE admits it also manufactured its own branded asbestos electrical insulation material, 'Genal,' essentially a Bakelite equivalent, warning-free until at least 1972."  (*Id.* at ¶ 206).

While GE does not dispute Plaintiff's general experiences on the *Purdy*, it does contest the extent to which Plaintiff's testimony concerning his exposure to asbestos implicated GE's products.  For starters, GE notes that while Plaintiff was stationed in the front engine room, he did not actually observe many of the events described in his testimony.  For example, GE points to Plaintiff's testimony that, although he was aware that maintenance was performed on the SSTG turbine, he did not observe that maintenance being performed.  (Def. 56.1 Reply ¶ 346).  GE also disputes that it designed or manufactured the equipment responsible for exposing Plaintiff to asbestos.  Most notably, GE contends that Westinghouse, not GE, manufactured the *Purdy*'s SSTG, including both its turbine and generator components.  (Def. 56.1 ¶ 16).  Relatedly, GE points to Plaintiff's concessions during his deposition that the generator component of the SSTG was not insulated and that maintenance performed on the generator (as opposed to the turbine) did not require disturbing asbestos.  (*Id.* at ¶ 34).

### 2.    Plaintiff's Civilian Career

Following his discharge from the Navy, Plaintiff worked as a union electrician for several Indianapolis-area electrical contractors between 1972 and 1980.  (Def. 56.1 ¶ 53; Pl. 56.1 Response ¶ 53).  Plaintiff testified that he worked with a "couple hundred" different pieces of electrical equipment manufactured by approximately eight different manufacturers, including GE, over this period.  (Pl. 56.1 ¶ 201; *see also* Pl. Dep. III 619:4-620:4).  This equipment included switchgear, motor control centers, safety

switches/disconnects, circuit breakers, breaker panels, relays, contactors, and arc chutes.  (Def. 56.1 ¶ 54; Pl. 56.1 Response ¶ 54).  Plaintiff testified in greater detail that he installed, removed, and repaired GE circuit breaker panels twice; disconnects three times; motor distribution panels one time; safety switches twice; contactors five times; relays ten times; and switch gears one time over the course of his career.  (Pl. 56.1 ¶ 202).  According to Plaintiff, each of these products contained asbestos.  (Pl. Dep. III 617:8-17; *see also* Pl. 56.1 ¶ 203).

More specifically, Plaintiff testified that the electrical equipment he worked with used asbestos encased in Bakelite to protect against electrical arcing.  (Pl. 56.1 ¶ 204).  Plaintiff would often come into contact with Bakelite as a result of electrical equipment's degradation, which would cause the Bakelite to crack, fall apart, and release asbestos dust into the air.  (*Id.* at ¶ 207).  Indeed, Plaintiff was able to discern Bakelite from regular plastic because "it would sometimes change colors to a blackish, purplish, brownish and actually crack open sometimes[.]"  (Pl. Dep. III 622:10-12).  Plaintiff also testified that he was exposed to Bakelite from his work on electrical equipment, which often required him to drill into, disassemble, air-hose, wire-brush, wipe down, and take apart the equipment.  (Pl. 56.1 ¶¶ 212, 214, 216-218).  Each of these processes released asbestos dust that Plaintiff then breathed in.  (*Id.*).  According to Plaintiff, he never saw an asbestos warning on any of the GE equipment with which he worked.  (*Id.* at ¶ 387).

In contrast with Plaintiff's service in the Navy, GE does not dispute that Plaintiff's civilian work led him to work extensively with GE's products. (Def. 56.1 ¶ 53). GE does, however, dispute Plaintiff's evidence that his exposure to these products caused him to come into contact with asbestos, pointing to Plaintiff's testimony that he never manipulated the asbestos insulation used in the products. (*Id.* at ¶¶ 57-73). In addition, GE disputes the extent to which it could have prevented Plaintiff from contracting mesothelioma by including warnings about the dangers of asbestos with its products, given that Plaintiff could not recall reading the contents of any manual, blueprint, specification, or similar document for any GE product. (*Id.* at ¶ 56).

### 3. Plaintiff's Cancer Diagnosis

Plaintiff first began experiencing symptoms presaging his ultimate cancer diagnosis in Spring 2019. (Def. 56.1 ¶ 8). Following a biopsy taken at Community Hospital South in Greenwood, Indiana, he was diagnosed with mesothelioma on September 17, 2019, at the age of 75. (Pl. 56.1 Response ¶ 11). Plaintiff thereafter received treatment in Indiana. (Def. 56.1 ¶ 12).

### B. Procedural Background

Plaintiffs filed the underlying Complaint in New York State Supreme Court on October 10, 2019, asserting claims against Air & Liquid, Westinghouse, Crane, Foster Wheeler, and GE. (Dkt. #4-1).[6] On November 18,

---

[6] On the same date, Plaintiffs also filed a separate state court action alleging many of the same claims against 44 additional defendants. (Dkt. #4-2). Plaintiffs explain that they "split the action as a preemptive measure" to prevent the removal of both actions to federal court. (Pl. 56.1 ¶ 1).

2019, Westinghouse removed the case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  (Dkt. #1).[7]  GE joined in the removal request on November 26, 2019.  (Dkt. #12).  The parties argued that removal was appropriate because both Defendants manufactured equipment for the *Purdy* under the authority, direction, and control of an officer or agency of the United States within the meaning of the officer removal statute.  (Dkt. #4, 12).

On January 28, 2020, shortly after the case was removed to federal court, Crane filed a letter stating that it had reached a settlement in principle with Plaintiffs.  (Dkt. #24).  The Court endorsed the letter the following day, conditionally discontinuing the action as to Crane.  (Dkt. #25).  Plaintiffs and Crane submitted a stipulation of discontinuance with prejudice and proposed order of dismissal on August 4, 2020 (Dkt. #63), which documents the Court so-ordered the same day (Dkt. #64).

On January 29, 2020, the Court held an initial pretrial conference at which counsel for Plaintiffs and Defendants Air & Liquid, Westinghouse, and GE were present.  (*See* Minute Entry for January 29, 2020).  Following the conference, on January 31, 2020, the Court issued a Civil Case Management Plan and Scheduling Order (the "CMP") that set forth the applicable discovery deadlines.  (Dkt. #26).  The CMP required any motion to file an amended pleading or to join additional parties to be filed within 45 days of the entry of

---

7       Due to a docketing error, Defendants' notice of removal was filed a second time on November 19, 2019.  (Dkt. #4).

the CMP.  (*Id.* at 1).  Approximately 42 days later, on March 13, 2020, Plaintiffs filed a motion to file an amended pleading, stating that discovery had revealed that John Crane, Inc. ("JCI"), had participated in the alleged acts underlying Plaintiffs' claims, and proposing to add JCI as a defendant.  (Dkt. #31).  The Court granted Plaintiffs' motion on March 15, 2020 (Dkt. #32), and Plaintiffs filed the Amended Complaint on March 17, 2020 (Dkt. #33).[8]

Several months later, on July 30, 2020, JCI filed a letter requesting an extension of the discovery deadlines set forth in the CMP.  (Dkt. #58).  JCI explained that Plaintiffs had not served JCI until July 1, 2020, despite filing the Amended Complaint on March 19, 2020, and receiving a summons for JCI the following day.  (*Id.*).  The Court granted JCI an extension of both the fact and expert discovery deadlines on July 31, 2020 (Dkt. #61), and entered an amended CMP that same day (Dkt. #62).  The Court later extended the discovery deadlines a third time, on November 25, 2020, upon the joint request of the parties.  (Dkt. #78, 79).  The third amended CMP ordered the parties to appear for a pretrial conference on December 9, 2020.  (Dkt. #79).

On December 4, 2020, the parties submitted a joint letter in advance of the pretrial conference.  (Dkt. #80).  The parties' letter stated that (i) certain fact discovery remained outstanding; (ii) the parties believed that a settlement conference would be beneficial; and (iii) GE and Westinghouse anticipated filing motions for summary judgment.  (*Id.*).  A few days after the parties submitted

---

[8]     Due to a docketing error, the Amended Complaint was refiled on March 19, 2020.  (Dkt. #37).

their joint letter, on December 8, 2020, Plaintiffs and JCI filed a stipulation of voluntary dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  (Dkt. #82).  The remaining Defendants then appeared for the pretrial conference, at which the Court confirmed the parties' desire to participate in mediation.  (*See* Minute Entry for December 9, 2020).  The Court issued a mediation referral order following this pretrial conference.  (Dkt. #83).

On March 1, 2021, evidencing the parties' unsuccessful mediation of Plaintiffs' claims, GE filed motions to preclude the testimony of Plaintiffs' two expert witnesses, Dr. Candace Su-Jung Tsai (Dkt. #90-92) and Francis J. Burger (Dkt. #93-95).  Plaintiffs filed briefs and supporting papers in opposition to GE's motions on March 22, 2021.  (Dkt. #106-109).  GE then filed reply briefs in further support of their motions on April 5, 2021.  (Dkt. #118-124).

Westinghouse and GE filed pre-motion letters on March 2, 2021, seeking permission to file motions for summary judgment.  (Dkt. #97 (GE), 98 (Westinghouse)).  On March 8, 2021, the Court set a briefing schedule for Defendants' contemplated motions.  (Dkt. #103).  Westinghouse and GE filed their opening motions on March 29, 2021.  (Dkt. #110-113 (GE), 114-117 (Westinghouse)).[9]  Prior to the deadline for Plaintiffs' opposition papers, on April 7, 2021, Plaintiffs and Westinghouse filed a notice of settlement, stating that the parties were in the process of completing a settlement and requesting that the Court vacate Westinghouse's pending *Daubert* and summary judgment

---

[9]     Certain exhibits were inadvertently omitted from Defendants' motion for summary judgment.  (Dkt. #127).  After the Court directed Defendants to refile the exhibits (Dkt. #128), Defendants did so on April 19, 2021 (Dkt. #129).

motions.  (Dkt. #125).  The Court conditionally discontinued the action against Westinghouse the next day (Dkt. #126), and later endorsed the parties' stipulation of discontinuance with prejudice on October 14, 2021 (Dkt. #151). On April 19, 2021, following the conditional dismissal of Westinghouse, Plaintiffs filed their brief, counterstatement to GE's Rule 56.1 statement, and supporting papers in opposition to GE's motion for summary judgment.  (Dkt. #130-132).  GE then filed a reply brief, declaration, and reply to Plaintiffs' Rule 56.1 statement on May 10, 2021.  (Dkt. #133-136).

The briefing continued from there.  On May 11, 2021, Plaintiffs sought leave to file a sur-reply in opposition to GE's motion for summary judgment, citing the "complexity of the claims made in Defendants' newly created 29-page affidavit" and other "newly raised issues" in GE's reply brief.  (Dkt. #137).  GE opposed Plaintiffs' request that same day, stating that Plaintiffs had failed to identify any new issues or arguments made in GE's reply brief.  (Dkt. #138). On May 12, 2021, the Court authorized Plaintiffs to file a sur-reply of no more than nine pages, permitted GE to file a sur-sur-reply of the same length, and stated that no further briefing would be permitted.  (Dkt. #139).  Thereafter, Plaintiffs filed their sur-reply on May 24, 2021 (Dkt. #144-145), and GE filed its sur-sur-reply on June 7, 2021 (Dkt. #146).  Finally, GE submitted supplemental authority on July 9, 2021 (Dkt. #147), and Plaintiffs did the same on July 12, 2021 (Dkt. #148).

## DISCUSSION

**A.    The Court Denies GE's Motion to Preclude Testimony from Plaintiff's Expert Dr. Candace Su-Jung Tsai**

Because it impacts resolution of the summary judgment motion, the Court begins by addressing GE's motion to exclude the testimony of one of Plaintiff's expert witnesses, Dr. Candace Su-Jung Tsai, pursuant to Federal Rules of Evidence 401-403, 702, and 703, and the Supreme Court's decision in *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[10]  As explained below, the Court finds that Dr. Tsai's testimony is sufficiently reliable to be admissible at trial.  The Court therefore denies GE's motion to preclude her testimony.[11]

---

[10]    GE also moved to exclude the testimony of Capt. Francis J. Burger (Ret.).  (Dkt. #93-95).  As explained later in this Opinion, however, the Court finds no genuine dispute of material fact as to Plaintiff's claims arising out of his service in the U.S. Navy.  Because Capt. Burger's testimony is limited to issues relating to Plaintiff's naval service, the Court deems GE's motion to preclude his testimony to be moot and declines to address it further here.

[11]    On March 17, 2022, Plaintiffs filed a letter seeking leave to file an amended memorandum of law in opposition to GE's motion to preclude Dr. Tsai's testimony and an additional exhibit in support of their memorandum.  (Dkt. #152).  Plaintiffs explained in their letter that GE had "asserted [its] belief that [Plaintiffs'] brief may contain inaccurate language in a single paragraph on page 7, and in citations at footnotes 19 and 20" and "represented that a failure to correct what they perceive to be an inaccurate statement will result in their pursuit of [Federal Rule of Civil Procedure 11(b)] sanctions[.]"  (*Id.* at 1).  While Plaintiffs maintained that they "based that paragraph on a good faith belief," they requested leave to file their proposed amended memorandum of law a new exhibit consisting of a 2018 presentation by Dr. Tsai at an AIHA conference discussing exposure assessment strategies.  (*Id.* at 2).

GE filed a responsive letter on March 17, 2022.  (Dkt. #154).  GE stated that it did not oppose Plaintiffs' filing of an amended memorandum of law "so long as GE is allowed sixty-minutes (exclusive of attorney colloquy) to depose Dr. Tsai on the new materials and opinions that were never previously disclosed, referenced or relied upon by Dr. Tsai in this matter," and further permitted to "submit an amended reply brief" following the deposition.  (*Id.*).

On March 22, 2022, the Court authorized Plaintiffs to file an amended memorandum of law but denied their request to submit Dr. Tsai's 2018 presentation as an exhibit to the memorandum, observing that Plaintiffs had been on notice of GE's objection to the memorandum since at least the filing of GE's reply brief and that expert discovery had

### 1.    Applicable Law

The Supreme Court has tasked district courts with a "gatekeeping" role

with respect to expert opinion testimony.  *Daubert,* 509 U.S. at 597 (holding

that it is the district court's responsibility to ensure that an expert's testimony

"both rests on a reliable foundation and is relevant to the task at hand").  This

"gatekeeping" function applies whether the expert testimony is based on

scientific, or on technical or "other specialized" knowledge.  *Kumho Tire Co.,*

*Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999).  "It is well-established that the

trial judge has broad discretion in the matter of the admission or exclusion of

expert evidence [.]"  *Boucher* v. *U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.

1996) (internal quotation marks and citation omitted).

Federal Rule of Evidence 702 provides that "[a] witness who is qualified

as an expert by knowledge, skill, experience, training, or education may testify

in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

concluded in February 2021.  (Dkt. #155).  Plaintiffs filed their amended memorandum
on March 23, 2022.  (Dkt. #157).

After Plaintiffs filed their amended memorandum of law, GE filed a letter requesting
leave to file a supplemental response to Plaintiffs' amended memorandum and attaching
a copy of GE's proposed supplemental response.  (Dkt. #158).  Observing that GE's
proposed supplemental response relied heavily on a February 10, 2022 deposition of Dr.
Tsai in another case (*see* Dkt. #158-1) and concerned a topic that GE had addressed in
its original reply brief (Dkt. #122), the Court stated that it would not permit GE to
introduce new evidence after it had precluded Plaintiffs from doing the same and thus
denied GE's request to file the proposed supplemental response (Dkt. #159).

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  A court's inquiry under Rule 702 focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact.  *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]"  *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

### 2.    Analysis

Dr. Tsai is an industrial hygiene expert who holds a B.S. in chemical engineering; M.S. degrees in both chemical engineering and management science; and a Sc.D. in cleaner production and occupational hygiene.  (Alonzo Decl., Ex. 20 (Dr. Tsai's curriculum vitae)).  At the time of her deposition, Dr. Tsai was an assistant professor at Colorado State University; by the time she issued her expert report in this case, she had been appointed as an associate professor at the Fielding School of Public Health at the University of California, Los Angeles.  (*Id.*., Ex. 22 (the "Tsai Report") at 1).

Dr. Tsai issued her report on October 5, 2020, and included an addendum on January 17, 2021.  (*See* Tsai Report).  Dr. Tsai begins her report by reviewing her qualifications, and then provides an overview of the materials

she reviewed while writing the report.  (*Id.* at 3).  These materials included: Plaintiff's answers to interrogatories, his deposition testimony, and his military records; litigation filings in this and his state cases; documents identifying the manufacturers of various pieces of equipment used on board the *Purdy*; a report from Plaintiff's expert pathologist, Dr. David Y. Zhang; a list of defendants; and numerous peer-reviewed articles.  (*Id.*).

Dr. Tsai then provides a general overview of the field of industrial hygiene and asbestos.  (Tsai Report 3-6).  As part of this discussion, Dr. Tsai explains what is known as the threshold limit value ("TLV") for asbestos, which she describes as a "recommended exposure standard[.]"  (*Id.* at 5).  Dr. Tsai notes that the TLV was first established in 1946 with a "maximum allowable concentration (MAC) of 5 million particles per cubic foot (mppcf) of dust containing asbestos[.]"  (*Id.*).  She states that the "TLV was changed to an 8-hour time-weighted average (TWA) of 5 mppcf in 1948," and again changed in 1974 "when it was revised to 5 fibers per cubic centimeter … for fibers" of a certain length.  (*Id.*).  "The TLV was reduced several more times," Dr. Tsai continues, "until in 1998 it reached its present value of 0.1 f/cm$^3$[.]"  (*Id.* at 6).

With this groundwork laid, Dr. Tsai then engages in a more detailed examination of various research articles analyzing the amount of asbestos released from various industrial tasks akin to those Plaintiff performed in the Navy and as a civilian electrician.  (Tsai Report 6-12).  For example, she examines asbestos exposures associated with work on insulation materials. (*Id.* at 6-8).  She cites to one 1946 study performed on Navy shipyard workers

finding "very high total dust counts related to pipe covering operations using asbestos insulation materials[.]" (*Id.* at 6). Likewise, Dr. Tsai discusses another study finding that between 2.5 and 8.6 mppcf of asbestos fibers were found to have been released when asbestos insulation was torn out. (*Id.* at 7). She goes on to discuss similar studies performed on gaskets and packing; insulation cloths; electrical materials; and friction materials. (*Id.* at 6-12).

Lastly, Dr. Tsai performs an "exposure evaluation" whereby she reviews the tasks Plaintiff performed both in the military and in the civilian context that would have exposed him to asbestos, the equipment involved in those tasks, and the environment in which he performed the tasks. (Tsai Report 12). Based on this evaluation, Dr. Tsai concludes that Plaintiff "had significant asbestos exposures aboard ship and from working with other asbestos containing products and materials discussed in" her report. (*Id.* at 16).

In moving to preclude Dr. Tsai's testimony, GE first argues that her testimony would not assist the trier of fact. (Def. Tsai Br. 9-10). Specifically, GE contends that Dr. Tsai's testimony adopts a scientifically baseless opinion that all of Plaintiff's exposures to asbestos were above background and thus significant. (*Id.* at 9). In GE's view, this opinion is irrelevant to the issues at hand in this case because it "intentionally avoids the issue as to what the exposure is from any GE product." (*Id.*). In other words, GE argues, Dr. Tsai's testimony fails to "address the issue before the jury: was the exposure to asbestos from GE products a substantial contributing factor in [P]laintiff's disease?" (*Id.* at 1).

At the outset, the Court notes that GE's argument rests on a misperception of Dr. Tsai's testimony and its relationship to Plaintiff's case. Dr. Tsai is an industrial hygienist, not an epidemiologist or a pathologist. This distinction is important because, as Plaintiffs observe, the purpose of Dr. Tsai's testimony is not to opine on whether GE's products were a substantial factor in causing Plaintiff's mesothelioma. (Pl. Tsai Opp. 12 (stating that "Dr. Tsai has been designated only as Plaintiffs' industrial hygienist, not a medical doctor, Naval historian, or state of the art expert")). That role has been assigned to Plaintiffs' expert pathologist, Dr. David Y. Zhang. (*Id.*; *see also* Alonzo Decl., Ex. 30 (Zhang report)). Rather, Dr. Tsai's testimony provides insight into the amount of asbestos that would typically be released while performing particular tasks on certain types of products (*e.g.*, removing insulation packing material from valves). (*See* Tsai Report 8). Plaintiff thus proffers Dr. Tsai's testimony to establish the evidentiary link between Plaintiff's own testimony regarding the tasks he performed and the equipment he encountered (*see, e.g.*, Pl. 56.1 ¶¶ 201-234), and Dr. Zhang's testimony establishing that the levels of asbestos exposure that Plaintiff encountered were a substantial factor in causing his mesothelioma (*see* Zhang Report 6).

Taken on its own terms, Dr. Tsai's testimony withstands GE's attacks. GE's first argument — that Dr. Tsai relies on an impermissible "every exposure" theory — is beside the point. As just stated, Dr. Tsai will not testify as to whether Plaintiff's work on GE products was a "substantial factor" in causing his mesothelioma. Instead, as reflected in the portion of Dr. Tsai's

deposition testimony on which GE relies to make its point, Dr. Tsai will testify that Plaintiff's particular job tasks would be expected to expose him to above-baseline amounts of asbestos.  (Def. Tsai Br. 10 (quoting Vega Decl., Ex. G ("Tsai Dep.") at 86 ("Q: What your standard has said an exposure above background is significant, therefore, the exposures are significant because they're above background, that's circular, isn't it, Doctor?  … A:  "The exposure to [Plaintiff] — I was saying exposure to him was above background … because he was exposed to it from the hands-on activity[.]"))).  Courts in this District have considered and rejected challenges to similar testimony.  *See, e.g.*, *Phelps* v. *CBS Corp.*, No. 17 Civ. 8361 (AJN), 2020 WL 7028954, at *8 (S.D.N.Y. Nov. 30, 2020) ("Because Plaintiff may offer evidence to establish facts upon which [the industrial hygienist] relies, including video testimony from [the plaintiff] and general testimony from the [p]laintiff's Naval Expert … [the industrial hygienist's] opinions cannot be excluded at this stage.").  Here too, Plaintiff may elicit testimony from Dr. Tsai that is dependent upon other evidence that will be introduced through other witnesses, including Plaintiff himself.

GE's related arguments are also unavailing.  For one, GE argues that Dr. Tsai's methodology lacks a clear hypothesis.  (Def. Tsai Br. 12-14).  With this argument, GE once again overlooks the purpose of Dr. Tsai's testimony, which is to opine on the amount of asbestos to which Plaintiff would have been exposed to as a result of work performed on various pieces of equipment.  Thus stated, Dr. Tsai's hypothesis is clear: the nature of the task, the material being

worked on, and the duration and frequency of the work on the material are causally related to levels of asbestos exposure. (*See* Pl. Tsai Opp. 14 (reviewing the factors Dr. Tsai considered in reaching her opinions)). Relatedly, GE argues that Dr. Tsai's methodology has not been subject to peer review. (Def. Tsai Br. 8). But GE does not dispute, much less discuss, any of the peer-reviewed publications discussed and cited in Dr. Tsai's report, or her reliance on them. (Tsai Report 6-12, 17-19).

GE's remaining arguments go to the weight, and not the admissibility, of Dr. Tsai's testimony. GE argues, for instance, that Dr. Tsai's methodology is "nothing but a litigation construct," pointing to the fact that her expert report uses a list of defendant companies provided by Plaintiffs' counsel. (Def. Tsai Br. 11-12). In a similar vein, GE argues that Dr. Tsai's testimony is "replete with examples of her simply ignoring evidence which does not support her pre-ordained conclusion." (*Id.* at 14). As one example, GE points to the fact that "Tsai went to great lengths to rely upon some two-page summary of ship equipment of unknown authorship or authenticity which listed the SSTGs as both Westinghouse and GE." (*Id.*). Finally, GE argues that Dr. Tsai "has no idea as to whether the [*Purdy*'s SSTGs] were even insulated with asbestos." (*Id.* at 15). While these may prove to be effective lines of cross-examination, they are not grounds for the preclusion of Dr. Tsai's testimony. Again, the purpose of Dr. Tsai's testimony is to "opine[] on the amount of exposure to asbestos dust from particular types of work [Plaintiff] performed throughout his career." (Pl. Tsai Opp. 12). GE may, of course, attempt to undermine the bases for Dr.

20

Tsai's opinions, such as by casting doubt on the reliability or accuracy of Plaintiff's testimony. But Dr. Tsai's reliance on materials provided by Plaintiff's counsel, or her knowledge of the *Purdy*'s equipment manufacturers, does not go to the reliability of her opinion, and thus is not a basis for the wholesale preclusion of her testimony. *See Phelps*, 2020 WL 7028954, at *9 (stating with respect to the admissibility of an industrial hygienist in a similar asbestos case that "any perceived gaps and inconsistencies in his reasoning are subject to cross-examination" and declining to preclude the testimony under *Daubert*).

Accordingly, the Court denies GE's motion to preclude the expert testimony of Dr. Tsai.

## B.    The Court Grants in Part and Denies in Part GE's Motion for Summary Judgment

Having resolved the issue of what evidence it may properly consider, the Court turns next to GE's motion for summary judgment. Broadly speaking, GE argues that it is entitled to summary judgment because Plaintiff has not shown that either GE's products or its failure to warn him of the risks of asbestos exposure was a substantial factor in causing his mesothelioma; that GE had no duty to warn Plaintiff of the risks of asbestos; and that GE is shielded from liability as to certain of Plaintiffs' claims under the government contractor defense. As the Court will explain, it finds there to be no genuine dispute of material fact as to Plaintiffs' claims arising out of Plaintiff's naval service. The Court thus declines to reach GE's government contractor defense. By contrast, it finds there to be triable issues of fact as to Plaintiff's claims related to his work as a civilian electrician.

### 1.    Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[12]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

---

[12]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, but cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal alterations omitted).

### 2.    The Parties Consent to the Application of Maritime Law

While the parties now agree that Plaintiff's claims should be resolved under maritime law (*see* Pl. Opp. 12-13; Def. Reply 1), that was not always the case.  Initially, the parties agreed that maritime law should govern Plaintiff's claims relating to his service aboard the *Purdy*.  (Def. Br. 5; Pl. Opp. 10).  GE contended, however, that Plaintiff's claims arising out of his work as a civilian electrician should be resolved under Indiana law, because such claims were based on asbestos exposure that allegedly occurred in Indiana.  (Def. Br. 8).  Plaintiffs pushed back against GE's choice-of-law analysis, arguing that GE's reliance on "the unpopular concept of 'dépeçage'" conflicted with New York's choice-of-law rules and, if adopted, would "unnecessarily prejudice Plaintiffs by confusing the jury." (Pl. Opp. 12).[13]  In its reply brief, GE conceded the point and stated that it agreed that maritime law "should apply to all claims[.]"  (Def. Reply 1).  Given the parties' ultimate agreement as to the substantive legal standards, the Court's choice-of-law analysis is relatively brief.

"To determine whether an alleged tort arises under maritime law, the Court looks to the two-part test articulated by the Supreme Court in *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995)."  *Phelps* v. *CBS Corp.*, No. 17 Civ. 8361 (AJN), 2021 WL 4226037, at *3 (S.D.N.Y. Sept. 16, 2021).  This two-part test comprises a "location test" and a "connection test."

---

[13]    "Dépeçage occurs where the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues.  The technique permits a more nuanced handling of certain multistate situations and thus forwards the policy of aptness."  *Corporacion Venezolana de Fomento* v. *Vintero Sales Corp.*, 629 F.2d 786, 794 n.8 (2d Cir. 1980).

The "location test" considers "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534.  If the location test is satisfied, the court then must consider the "connection test."  *Id.*  Under the connection test, the court must "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce," and "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Id.* (internal quotation marks and citations omitted).

Here, the Court has no difficulty finding that Plaintiff's claims arising out of his naval service satisfy both the location and connection tests.  Plaintiff's alleged asbestos exposure during this period satisfies the location test because the exposure occurred while the *Purdy* was either at sea or dry-docked for repairs at the Brooklyn Naval Shipyard.  (Def. 56.1 ¶ 50; Pl. 56.1 Response ¶ 50).  *See Vasquez* v. *GMD Shipyard Corp.*, 582 F.3d 293, 299 (2d Cir. 2009) (observing that a ship docked for repairs is "still in 'navigable waters' for purposes of federal admiralty jurisdiction"); *see also Phelps*, 2021 WL 4226037, at *3 (finding location test satisfied where ship was temporarily drydocked). Likewise, these claims meet the "connection test" because they rest on allegations that "a naval worker was injured during repair and/or maintenance to a completed vessel."  *Phelps*, 2021 WL 4226037, at *3 (finding that alleged asbestos exposure satisfied the connection test).  Accordingly, the Court finds that maritime law applies to Plaintiff's claims arising out of his naval service.

The Court also finds that maritime law applies to Plaintiff's claims arising out of his work as a civilian electrician.  To be sure, Plaintiff's alleged exposure during his work as a civilian electrician did not occur on navigable waters and has no clear bearing on maritime commerce.  (*See* Def. 56.1 ¶ 53).  While these shortcomings might ordinarily preclude the application of maritime law, the Court finds the parties' consent sufficient to warrant its application here.  *See In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 64 (S.D.N.Y. 2009) (applying maritime law based on the parties' agreement that it applied), *opinion adhered to on reconsideration*, 643 F. Supp. 2d 553 (S.D.N.Y. 2009), and *aff'd sub nom. Chem One, Ltd.* v. *M/V RICKMERS GENOA*, 502 F. App'x 66 (2d Cir. 2012) (summary order); *see also Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (remarking that "[t]he parties' briefs assume that New York law controls, and such implied consent ... is sufficient to establish choice of law" (internal quotation marks omitted)); *Tesla Wall Sys., LLC* v. *Related Companies, L.P.*, No. 17 Civ. 5966 (JSR), 2018 WL 4360777, at *2 (S.D.N.Y. Aug. 15, 2018) (stating that "[w]hen a party assumes in its briefs that a particular jurisdiction's law applies, it gives implied consent sufficient to establish choice of law" (internal quotation marks and alterations omitted)). The Court therefore applies maritime law to each of Plaintiffs' claims.

### 3. Genuine Disputes of Fact Exist as to Plaintiff's Asbestos Exposure During His Civilian, But Not His Naval, Career

The Court starts with GE's motion for summary judgment as to Plaintiffs' claims for defective design and manufacture.  GE argues that summary judgment is appropriate because there is no genuine dispute as to the

causation element of Plaintiffs' claims.  As explained below, the Court finds there to be no genuine dispute of material fact with respect to the claims arising out of Plaintiff's service on the *Purdy*.  By contrast, there is a genuine dispute with respect to Plaintiff's civilian work.

### a.   Applicable Law

"General maritime law provides a cause of action for product liability, brought either under a theory of negligence or strict liability." *Pace* v. *Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 264 (S.D.N.Y. 2016).  Under either theory, "the plaintiff must prove, for each defendant, that [i] he was exposed to the defendant's product, and [ii] the product was a substantial factor in causing the injury he suffered." *Holzworth* v. *Alfa Laval Inc.*, No. 12 Civ. 6088 (JFK), 2016 WL 270450, at *3 (S.D.N.Y. Jan. 21, 2016) (internal quotation marks omitted).  "[A] mere showing that defendant's product was present somewhere at plaintiff[']s place of work is insufficient." *Perkins* v. *Air & Liquid Sys. Corp.*, No. 13 Civ. 8561 (CM), 2015 WL 4610671, at *6 (S.D.N.Y. July 30, 2015).  "Rather, where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id.*

### b.   Naval Claims

GE argues first that it is entitled to summary judgment on Plaintiffs' claims arising out of Plaintiff's naval service because Plaintiff has not shown either that he was exposed to asbestos due to contact with equipment

manufactured by GE or, even assuming that he was exposed to such equipment, that such exposure was a substantial factor in causing his mesothelioma.  (Def. Br. 15-16, 18-20).  More specifically, GE argues that Plaintiff's claims premised on his exposure to the *Purdy*'s SSTG must fail because Westinghouse, not GE, manufactured the SSTG's turbine, and Plaintiff has not shown that he was exposed to asbestos from the SSTG's uninsulated generator.  The Court agrees and therefore grants summary judgment as to Plaintiffs' claims arising from Plaintiff's naval service.

At the outset, both parties spend a substantial portion of their briefs debating who manufactured the *Purdy*'s SSTG generator.  (*See, e.g.*, Def. Br. 15-17; Pl. Opp. 7, 24-25).  In GE's view, the answer is clear: Westinghouse. GE cites in support of its position (i) a 1943 agreement reflecting that Westinghouse would provide the *Purdy* with "two ships service turbine generators" (Vega Decl., Ex. 16 at ¶ 5); (ii) two naval inspection reports, published in 1947 and 1954, finding that the *Purdy* operated two Westinghouse turbines (*id.*, Ex. 17 at 22; *id.*, Ex. 18 at 5); and (iii) Westinghouse's admission, made before it reached a settlement agreement with Plaintiffs in this case, that it "provided the Navy various items of equipment that were installed aboard the *Purdy* during her construction in the 1940s, including the … ship-service generators … *both the generators and turbines*[.]"  (Def. 56.1 ¶ 16 (emphasis added)).  Plaintiff vigorously disputes the significance of GE's evidence (Pl. 56.1 ¶¶ 235-260), pointing to (i) Westinghouse's lack of records relating to the *Purdy*'s generator; (ii) Plaintiff's

testimony that "the generator was — I think it was GE, to the best of my knowledge" (Pl. Dep. III 411:9-10); and (iii) Plaintiffs' expert's testimony that his review of the relevant records demonstrated that GE, not Westinghouse, manufactured the generator (Pl. 56.1 ¶¶ 245-246).

The Court declines to wade into the parties' dispute over the *Purdy*'s generator, because even assuming for the purpose of argument that GE manufactured the generator component of the *Purdy*'s SSTG, Plaintiff has not set forth any evidence suggesting that he was exposed to asbestos from the generator. To be sure, Plaintiff's briefing and Rule 56.1 statement contend otherwise. Plaintiff argues in his opposition brief, for instance, that he was "questioned by defense counsel as to whether or not the frequent maintenance of the generator involved the use or disturbance of asbestos-containing materials," to which he answered, "[o]f course. There's dust on all this stuff." (Pl. Opp. 25 (citing Pl. 56.1 ¶ 188)). Plaintiff also states in his Rule 56.1 statement that he was exposed to asbestos dust from work performed on the *Purdy*'s generator. (Pl. 56.1 ¶¶ 186-188). Based on Plaintiff's deposition testimony, Dr. Tsai noted that "Mr. Pritt had to remove the cover on the turbo generator to perform his jobs and it was a dusty process[.]" (Tsai Report 13 (citing Pl. Dep. III 571-72); *see also* Tsai Dep. 118:21-119:1).

As it happens, Plaintiff's deposition testimony does not support his claim that any product designed or manufactured by GE exposed him to asbestos. In response to detailed questioning about the maintenance work performed on the generator, Plaintiff testified that the dust he observed was residual "carbon

dust" deposited from the carbon brushes contained within the SSTG.  (Pl. Dep. III 419:12-14).  Plaintiff also agreed with defense counsel that the work he was describing on the generator was "not something that involved … the use or disturbance of asbestos-containing materials."  (*Id.* at 419:23-420:2). Elsewhere in his deposition testimony, Plaintiff again affirmed that dust he observed on top of the *Purdy*'s generator was "[d]ust from the general environment" that "could have come from anything" (*id.* at 421:15-22), and that the generator was not insulated with asbestos (*id.* at 421:23-422:4).  This testimony directly undercuts Plaintiff's otherwise conclusory claim that he was exposed to asbestos from the *Purdy*'s SSTG generator.

Plaintiff separately suggests that he was exposed to asbestos dust from GE "electrical equipment" that was released into the air when the *Purdy* would shoot its guns.  (Pl. 56.1 ¶ 192 (citing Pl. Dep. III 641:1-16)).  In point of fact, Plaintiff's testimony on this issue does not clearly establish the source of the dust.  Plaintiff was asked, "[w]hen the guns went off on the ship, did that make the Bakelite material on the electrical vibrate as well?"  (Pl. Dep. III 641:1-3). He answered that such discharges "[m]ade everything vibrate, yes" (*id.* at 4), and then stated that the dust came from products associated with Westinghouse, GE, Allen-Bradley, Cutler-Hammer, Square D, ITE, and Bullfrog (*id.* at 641:10-642:3).  Plaintiff did not, however, identify the particular products from which he believed the dust came.  Neither does Plaintiff point to any portion of Dr. Tsai's report or testimony addressing the amount of asbestos that would be expected to be released due to the vibrations caused by the firing

of a gun like that on the *Purdy*.  Nor does Plaintiff cite to any other record

evidence demonstrating that such force would cause a substantial exposure.

To the contrary, when asked about Plaintiff's exposure to asbestos from the

*Purdy*'s generator, Dr. Tsai pointed only to his statement that working on the

generator was a "dusty process."  (Tsai Dep. 420 (citing Pl. Dep. III 572)).

Because Plaintiff later clarifies that the dust associated with that work

consisted of carbon dust and dust from the general environment, he has not

shown either that he was exposed to asbestos from the ship's firing of its guns

or that such exposure was more than minimal.  Plaintiff has thus not raised a

genuine dispute as to whether the generator caused his mesothelioma.  *See*

*Carlson* v. *CBS Corp.*, No. 17 Civ. 1916 (VLB), 2020 WL 70814, at *2 (D. Conn.

Jan. 7, 2020) (observing that under maritime law, "'[m]inimal exposure' to a

defendant's product is insufficient to establish causation," and "a mere

showing that defendant's product was present somewhere at plaintiff's place of

work is insufficient" (quoting *In re Asbestos Litig.,* No. 18 Civ. 410 (LPS) (SRF),

2019 WL 6211371, at *3 (D. Del. Nov. 20, 2019))); *see also Perkins*, 2015 WL

4610671, at *8 (stating that the plaintiff "cannot prevail, under either New York

or maritime law, simply by showing that [the plaintiff] was present on a ship

that contained [the defendant's] products that were wrapped in asbestos").[14]

---

[14]    To the extent Plaintiff seeks to base his claims on the fresh water pump or lubricating
oil purifier pump referenced in his Rule 56.1 statement (*see* Pl. 56.1 ¶ 189), he has not
identified evidence in the record indicating that either pump exposed him to asbestos.
This equipment thus also fails to establish the requisite causation for his product
liability claims.

Once the generator is removed from the picture, Plaintiff is left to rely on his testimony that he was exposed to asbestos from the *Purdy*'s SSTG turbine. (Pl. Opp. 24-26; *see also* Pl. 56.1 ¶¶ 175-185).  Plaintiff identified several maintenance tasks performed on the turbine that purportedly exposed him to asbestos dust.  For example, Plaintiff testified that once or twice each year his crewmates would replace the turbine's gaskets.  (Pl. Dep. III 574:6-10; *see also id.* at 661:20-24)).  To do so, Plaintiff's crewmates would remove the old gaskets and scrape and wire-brush the flanges clean before installing a new gasket. (*Id.* at 575:16-24).  Similarly, Plaintiff testified that his crewmates also replaced the turbine's packing glands every six months to a year, which required them to spend approximately 30 minutes scraping a flange clean and another five minutes wire-brushing it.  (*Id.* at 576:25-577:22, 580:5-12).  Plaintiff testified that both of these maintenance processes were "dusty," leading him to breathe in significant amounts of asbestos.  (*Id.* at 574:20-22, 578:3-5).  Finally, Plaintiff testified that maintenance performed on the turbine while the *Purdy* was docked at the Brooklyn Naval Shipyard also exposed him to asbestos dust.

Plaintiff's exposure to asbestos from the *Purdy*'s turbine cannot support his claim against GE.  As both parties and their expert witnesses agree, Westinghouse, not GE, manufactured the turbine.  (*See, e.g.*, Pl. Dep. I 50:24-25 (testifying that "Westinghouse, I think, were the main turbines"); Pl. 56.1 ¶ 235 (stating that the *Purdy*'s "SSTG had a GE generator end and a Westinghouse turbine end"); Def. 56.1 ¶ 16 (stating that Westinghouse provided the Navy with the *Purdy*'s "ship-service turbine generators ... both the

generators and turbines"); Alonzo Decl., Ex. 6 (deposition of Capt. Francis J. Burger) at 24:9-10 (stating that the *Purdy*'s hull machinery synopsis reflected that "Westinghouse made the turbine"); Vega Decl., Ex. 16 (expert report of Roy Belanger) at ¶ 5 (stating that "in or about 1943 Westinghouse supplied the United States Navy with … two ships service turbine generators")).

Notwithstanding the fact that GE did not manufacture the *Purdy*'s turbine, Plaintiff suggests that it can still be held liable for the equipment because the turbine was made according to GE's design. (Pl. Opp. 7 (arguing that "GE is not only one of the manufacturers of the SSTGs, but is also the overall designer of the SSTGs")). Plaintiff bases this claim primarily on the purported fact that GE authored the "manual for *all* SSTGs used on *Sumner* class ships such as the *Purdy*." (*Id.* (citing Pl. 56.1 ¶¶ 236-239); *see also* Alonzo Decl., Ex. 9 (the "GE Manual")). Plaintiff draws further support from the testimony of a GE corporate representative, David Hobson, provided in an unrelated Massachusetts case. (Pl. 56.1 ¶¶ 256-260).

The Court finds that there is no genuine dispute as to whether GE designed the *Purdy*'s turbine. Beginning with the manual, the Court notes that Plaintiff has not actually linked the manual to the *Purdy*. While the manual's front cover states that it is "for U.S. Destroyers DD692 Class," it further provides that it applies to a Navy contract denoted as 47347. (GE Manual 000812). Plaintiff concedes that this contract number is "of unknown scope, rather than [for] a specific set of ships," but argues that "Defendant has not offered any evidence establishing any difference in design, function, or

components between" the *Purdy*'s SSTG and the SSTGs used on other DD692-class ships.  (Pl. 56.1 ¶ 236 n.12).  But it is Plaintiff's burden, not GE's, to demonstrate a genuine dispute, and Plaintiff has not shown that the manual is applicable to the *Purdy*.  Moreover, even assuming that the GE Manual did apply to the *Purdy*, Plaintiff has not linked the authorship of the manual to the design of the equipment.  To the contrary, Plaintiff's own expert testified that "[i]t probably comes down to only Westinghouse[.]"  (Vega Decl., Ex. 13 at 158:7-9 (stating, after being asked who was responsible for the insulation used on the *Purdy*'s SSTG turbine, that "[i]t probably comes down to only Westinghouse could decide, it's their responsibility, it's their turbine, it's their contract")).

Plaintiff's reliance on the testimony of GE corporate representative David Hobson is also unavailing.  Plaintiff suggests that "GE has ... acknowledged through its turbine representative David Hobson that the wartime effort required the application of GE's standard SSTG design to the entire DD692 class."  (Pl. 56.1 ¶ 236 n.12 (citing Alonzo Decl., Ex. 15 ("Hobson Dep.") at 38-40)).  Once again, Plaintiff's cited testimony does not support his claim.  Hobson did not testify that GE designed the SSTG turbines used on the entire DD692 class of Navy destroyers.  Instead, he was asked, "[h]ave you ever seen where the United States Navy had drawings of its own or that it acquired from others that it presented to General Electric and requested that they manufacture turbines to those drawings."  (Hobson Dep. 38:14-18).  Hobson then stated "[d]uring World War II that was common practice."  (*Id.* at 38:19-

20).  He further testified that he had "seen where the United States Navy took the G.E. turbine design and gave it to Allis-Chalmers and Westinghouse and requested that they manufacture the G.E. design" (*id.* at 39:1-4), and, more broadly, that "there was a major swap of design information to different manufacturers to get in the supply pipeline" (*id.* at 40:3-6).  Thus, Hobson's testimony merely reflects that many manufacturers, GE and Westinghouse included, used one another's designs during the period that the *Purdy* was built.  It does not purport to stand for the claim that GE designed the *Purdy*'s turbine.  Accordingly, Plaintiff lacks evidence sufficient to create a genuine dispute as to GE's role in manufacturing or designing the *Purdy*'s SSTG turbine.

To review, Plaintiff alleges that he was exposed to asbestos while serving on the *Purdy* due to his close contact with the ship's SSTG.  Plaintiff has not, however, put forward evidence that ties GE to that alleged exposure.  The parties debate whether GE manufactured the generator portion of the SSTG, but Plaintiff has not established that he was exposed to asbestos from the generator.  By contrast, Plaintiff present clear evidence suggesting that he was exposed to asbestos from the turbine portion of the SSTG, but has not shown that GE manufactured or designed the turbine.  Accordingly, because no reasonable factfinder could find that Plaintiff was exposed to a GE product that was a substantial factor in causing his mesothelioma, the Court grants summary judgment as to Plaintiffs' product liability claims arising out of Plaintiff's service aboard the *Purdy*.

### c.    Civilian Claims

GE argues next that Plaintiff cannot establish causation based on his exposure to asbestos as a civilian electrician.  In contrast with Plaintiff's naval exposure, GE does not dispute that Plaintiff worked with GE products over this period.  Rather, in challenging Plaintiff's civilian claims, GE argues that Plaintiff has not established that (i) the GE equipment with which he worked contained asbestos and (ii) the products with which he worked were a substantial factor in his causing his mesothelioma.  (Def. Br. 17-18).  The Court finds there to be genuine disputes of material fact as to both issues, and thus denies GE's motion for summary judgment on Plaintiff's claims arising out of his civilian career.

Plaintiff's claims arising out of this period of his life are straightforward. As a union electrician, Plaintiff worked with numerous GE products between 1972 and 1980.  (Pl. Dep. III 619:4-620:4).  He worked, for example, on GE-branded circuit breaker panels, disconnects, motor distribution panels, safety switches, contactors, relays, and switch gears.  (Pl. 56.1 ¶ 202; Def. 56.1 ¶ 54). Plaintiff testified that he often encountered asbestos while working on this equipment.  (Pl. 56.1 ¶¶ 203-204, 207-234).  For example, Plaintiff testified that he would use an air hose, a wire brush, and a cloth to keep various pieces of GE equipment free of accumulated asbestos dust.  (Pl. Dep. III 624:5-626:4). He also testified that he often drilled and cut into certain electrical equipment, and that this work released asbestos dust that he then inhaled.  (*Id.* at 630:14-631:12).

GE contends that Plaintiff has failed to raise a genuine dispute of material fact for two reasons, neither of which is persuasive.  *First*, GE argues that Plaintiff has failed to put forward proof, "other than his own speculation," that the GE products with which he worked as a civilian electrician contained asbestos.  (Def. Br. 17).  But Plaintiff's testimony on this point is more than speculation.  In contrast with his testimony regarding the *Purdy*'s SSTG, Plaintiff testified that his work as a union electrician put him into contact with specific pieces of electrical equipment manufactured by GE.  (Pl. 56.1 ¶ 202).  Indeed, Plaintiff was able to identify not only the equipment (*e.g.*, circuit breaker panel), but also the number of times he worked on such equipment (three times).  (*Id.*).  Plaintiff further testified in detail how his work on GE's equipment caused him to come into direct contact with asbestos and asbestos dust.  For example, on about 20 occasions, Plaintiff ran a conduit through a GE panel.  (*Id.* at ¶ 217).  This operation required Plaintiff to use a drill to start a hole, and then cut through it using a hole saw.  (*Id.*).  In doing so, Plaintiff caused the panels to release respirable dust from the internal Bakelite material, which dust he then breathed.  (*Id.*).  To be sure, GE disputes much of Plaintiff's testimony.  GE argues, for instance, that its electrical panels did not require drilling and cutting because the panels "came with pre-creased 'knock-outs' the user could easily remove to gain access for conduit."  (Def. 56.1 Reply ¶ 217).  Construing the evidence in the light most favorable to Plaintiff, however, a reasonable factfinder could credit his testimony that his work on these products released significant amounts of asbestos dust.  *See Pace*, 171 F.

Supp. 3d at 276 (finding that genuine dispute of material fact existed where the "daylight" between plaintiff's testimony and defendant's rebuttal witness "be[spoke] a genuine issue of material fact").

*Second*, GE argues that Plaintiff has not shown that any GE product he worked with as a union electrician was a substantial factor in causing his mesothelioma.  In this regard, GE contends that it is undisputed that Plaintiff "never at any time cut, drilled, ground, sanded, or otherwise manipulated an alleged asbestos-containing component in any GE electrical equipment."  (Def. Br. 17 (citing Def. 56.1 ¶¶ 58-71)).  GE also points to testimony from Plaintiff's expert, Dr. Tsai, who stated "I did not quantify specific company's product in terms of the significant exposure or not."  (*Id.* at 18 (quoting Def. 56.1 ¶ 67)).  Based on these two points, GE argues that "[t]here is no evidence in the record" that Plaintiff "disturbed any components in GE electrical products *at all*, much less with the requisite frequency, proximity, and regularity to prove substantial factor causation as a matter of law."  (*Id.*).  The Court is not persuaded.

While GE correctly observes that Plaintiff testified that he did not cut, drill, grind, sand, or otherwise manipulate asbestos located inside GE's products (Pl. Dep. III 438:25-439:18), it overlooks other critical portions of his testimony.  Plaintiff testified, for example, that the insulation material located inside electrical panels he worked on would "crack and fall apart" as it degraded over time.  (*Id.* at 618:18-20).  Plaintiff further testified that, due to his work on these panels, he would breathe in the asbestos dust released from their degrading insulation.  (*Id.* at 618:25-619:2).  Relatedly, Plaintiff testified

38

that removing various pieces of electrical equipment caused the insulation material to vibrate and release dust, which he inhaled.  (*Id.* at 620:11-22).  And contrary to GE's suggestion, Plaintiff's showing of substantial exposure is not limited to Dr. Tsai's testimony.  As reflected in Plaintiff's briefing on GE's admissibility challenge to Dr. Tsai's testimony, Plaintiff will seek to establish causation using both Dr. Tsai and Dr. Zhang.[15]  Plaintiff explains that Dr. Tsai will "opine[] on the amount of exposure to asbestos dust from particular types of work Mr. Pritt performed throughout his career."  (Pl. Tsai Br. 12).  Dr. Zhang, meanwhile, will "provide[] the analysis regarding … electrical products as substantial contributing factors to Mr. Pritt's mesothelioma[.]"  (*Id.*).  When Dr. Zhang's testimony is considered alongside Dr. Tsai's testimony explaining that Plaintiff's "hands-on activity" would lead to asbestos releases "above background," a reasonable factfinder could find that Plaintiff was exposed to asbestos from GE's products with sufficient frequency, proximity, and regularity to constitute a substantial factor in causing his mesothelioma.

While GE may seek to undercut the reliability of Plaintiff's testimony or the relevance of his experts' opinions at trial, Plaintiff has sufficiently

---

[15]    GE suggests for the first time in its Rule 56.1 Reply that Dr. Zhang's report is inadmissible "as unsworn expert reports are not sufficient to oppose summary judgment."  (*See, e.g.*, Def. 56.1 Reply ¶ 398 (citing, *inter alia*, Fed. R. Civ. P. 56(e)).  The Court notes, however, that GE's challenge appears to be premised on a prior version of Rule 56.  As currently written, Rule 56 provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Here, GE has merely challenged the present admissibility of Dr. Zhang's testimony, not Plaintiffs' ability to present it in a form that would be admissible at trial.  Absent a more detailed objection, the Court has no basis to find that Plaintiffs would be unable to present Dr. Zhang's testimony in a form admissible at trial.

demonstrated that there is a genuine dispute as to whether GE's electrical products were a substantial factor in causing his mesothelioma.  *See Phelps*, 2020 WL 7028954, at *15 (rejecting similar "frequency, proximity, and regularity" arguments and finding that plaintiff's expert testimony and other evidence raised genuine dispute of material fact as to whether defendant's products were substantial factor in causing plaintiff's mesothelioma); *Berman*, 2019 WL 1510941, at *7-8 (denying summary judgment in asbestos case on the basis that testimonial, documentary, and expert evidence sufficed to create genuine issue of material fact as to causation).  Accordingly, the Court denies GE's motion for summary judgment as to Plaintiff's products liability claims related to his work as an electrician.[16]

### 4.   Genuine Disputes of Fact Exist as to GE's Failure to Warn During Plaintiff's Civilian, But Not His Naval, Career

The Court turns next to GE's motion for summary judgment with respect to Plaintiffs' failure to warn claims.  GE argues that it is entitled to summary judgment because (i) it was under no duty to warn Plaintiff of the risks

---

[16]   The parties focus much of their briefing on the relevance of the National Electric Code ("NEC").  (*See, e.g.*, Def. Br. 17; Def. Reply 6; Pl. Surreply 8; Def. Response 5-6).  Citing Plaintiff's deposition testimony, GE argues that Plaintiff "acknowledged that disturbing the integrity of any electrical equipment components" by cutting, drilling, grinding, sanding, or otherwise manipulating them would violate the NEC.  (Def. Br. 17).  GE draws from this testimony that Plaintiff never engaged in such activities, thereby demonstrating that Plaintiff was not exposed to asbestos from GE electrical equipment.  (*Id.*).  While this issue may be a fruitful area of cross-examination, it does not negate the existence of a genuine dispute as to Plaintiff's exposure to asbestos while working on GE's electrical equipment during his career as an electrician.  Plaintiff testified to several tasks he performed as an electrician that did not involve drilling, grinding, or other forms of manipulation that GE contends would not violate the NEC, but that still exposed him to asbestos dust.  (*See, e.g.*, Pl. 56.1 ¶¶ 223-234).  GE, of course, disputes these claims (*see* Def. 56.1 Reply ¶¶ 223-234), underscoring the existence of a genuine dispute that must be resolved by the factfinder in this case.

associated with any equipment manufactured for the *Purdy* and (ii) Plaintiff has

not shown that any alleged failure to warn caused his injuries.  As explained

below, the Court finds no genuine dispute as to Plaintiff's claim arising out of

his service in the Navy and therefore grants summary judgment as to that

claim.  By contrast, the Court finds a genuine dispute with respect to his

civilian claim.

### a.    Applicable Law

"Maritime law has ... recognized common-law principles of products

liability for decades]"  *Air & Liquid Sys. Corp.* v. *DeVries*, 139 S. Ct. 986, 993

(2019).  Under these principles, "a plaintiff seeking to recover in tort for

asbestos exposure on a theory of ... failure to warn must prove that exposure to

the defendant's product proximately caused his injuries."  *Holzworth*, 2016 WL

6109139, at *3; *see also Sebright* v. *Gen. Elec. Co.*, 525 F. Supp. 3d 217, 243

(D. Mass. 2021) (stating that under maritime law, "[a] products liability plaintiff

alleging failure to warn must prove that the absence of adequate warnings or

instructions was the proximate cause of plaintiff's injury" (internal quotation

marks omitted)); *See Pace*, 171 F. Supp. 3d at 264 (stating that "[i]f Plaintiff

fails to present sufficient evidence establishing exposure, the Court need not

address Plaintiff's related claims against Defendants for ... failure to warn").

### b.    Naval Claim

The Court finds that no genuine dispute exists as to Plaintiff's failure to

warn claim arising out of his service on board the *Purdy*.  As the Court

previously explained, Plaintiff has not shown that he was substantially exposed

to asbestos from a GE product during his Navy service.  It follows that Plaintiff has not established that GE's alleged failure to warn Plaintiff of the dangers posed by any of its products caused his injuries.  Accordingly, the Court grants summary judgment as to this claim.

### c.   Civilian Claim

Turning to Plaintiff's failure to warn claim related to his work as a civilian electrician, GE argues that summary judgment is appropriate because there is no causal connection between its failure to warn and Plaintiff's mesothelioma.  (Def. Br. 20-21; Def. Reply 7).  GE bases its argument on two points.  *First*, GE contends that Plaintiff never read a GE manual and thus the lack of a warning in GE's manuals could not have caused Plaintiff's mesothelioma.  (Def. Br. 20-21).  *Second*, GE argues that even if it had warned Plaintiff of the dangers associated with asbestos, Plaintiff's deposition testimony demonstrates that he would not have heeded those warnings, and thus the warnings would not have mattered.  (*Id.*).  On this latter point, GE points in particular to the following exchange between its counsel and Plaintiff:

> Q. Nonetheless, sir, had GE warned you, would that have changed your — your —
>
> A.  Had GE come and personally warned me?
>
> Q.  Or, you know, on the box or anything.   If you'd read —
>
> A.  Well —
>
> Q.   — read something on the box, would that have changed your behavior at all?

> A.  No.  If they put it on the box for me to read, it was there —
>
> Q.  Still would have done — still would have done the same work, correct?
>
> [Objection]
>
> A.  Same.

(Def. Br. 20 (citing Pl. Dep. III 490:20-491:8)).

Plaintiff challenges both arguments.  With respect to whether Plaintiff read GE manuals, Plaintiff points to his testimony that he was "sure [he] did" see "any manuals, blueprints, specifications, or any of those written materials for the Westinghouse switchgear."  (Pl. Dep. III 437:6-9; *see also id.* at 454:25-455:9 (counsel for Westinghouse and GE stipulating that Plaintiff's testimony regarding switchgear would be the same for the two companies)).  He also relies on his statements that he had read, handled, and worked with the packaging and equipment for several other GE products (Pl. 56.1 ¶¶ 356-358), and that he would have seen and read any warnings placed on the packaging or equipment (*id.* at ¶ 358).  And with respect to GE's argument that Plaintiff would not have changed his behavior in response to a warning, Plaintiff disputes GE's interpretation of his deposition testimony.  (Pl. 56.1 Response ¶ 81).  Plaintiff contends that his agreement with GE's counsel's statement that he "still would have done the same work" reflects only his agreement that his job responsibilities would have remained the same irrespective of any warning.  (*Id.*).  To the extent his statement is ambiguous, Plaintiff states that such ambiguity is a product of defense counsel's interruptions and phrasing.  (*Id.*).

43

Finally, Plaintiff argues that measures he took after 1980 to protect himself from asbestos, including by wearing respiratory protection, demonstrate that he would have altered his behavior in response to a warning.  (*Id.*).

The Court finds that Plaintiff has raised a genuine dispute as to causation.  While Plaintiff could not recall ever reading a particular GE manual, a reasonable factfinder could credit Plaintiff's testimony that he would have seen a warning located elsewhere, such as on the equipment itself, based in part on the fact that Plaintiff testified to handling numerous GE electrical parts throughout his career.  (*See, e.g.*, Pl. 56.1 ¶¶ 201-234).  Similarly, the factfinder could also reasonably find that Plaintiff would have heeded such a warning, as demonstrated by his subsequent decision to wear a respirator after learning more about asbestos.  (*Id.* at ¶¶ 389-395).  Accordingly, the Court denies GE's motion for summary judgment as to Plaintiff's failure to warn claim arising out of his work as a civilian electrician.

### 5.    The Court Denies Summary Judgment as to Plaintiffs' Claims for Loss of Consortium and Punitive Damages

Lastly, the Court addresses Plaintiffs' claims for loss of consortium and punitive damages.  After conceding in its reply brief that maritime law should apply to Plaintiff's Navy *and* civilian claims, GE argued for the first time that summary judgment should be entered on Plaintiffs' loss of consortium and punitive damages claims because maritime law does not recognize such claims. (Def. Reply 1-2).  This procedural history has placed this case on unfamiliar footing.  Having found that summary judgment is appropriate as to Plaintiffs' claims arising out of his naval service but not his civilian work, the Court is left

to resolve whether maritime law permits the recovery of loss of consortium and punitive damages arising out of activity that occurred entirely within the state of Indiana.  The Court finds that it does.

Although neither party nor the authorities cited in their briefs address an analogous situation, the Court finds the Supreme Court's decision in *Atlantic Sounding Co., Inc.* v. *Townsend*, 557 U.S. 404 (2009), to be instructive.  There, the Supreme Court addressed whether "an injured seaman may recover punitive damages for his employer's willful failure to pay maintenance and cure" under maritime law.  *Id.* at 407.  The Court resolved the question by turning to first principles.  It observed first that "[p]unitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct."  *Id.* at 409.  The Court then observed that "[t]he general rule that punitive damages were available at common law extended to claims arising under federal maritime law."  *Id.* at 411.  Lastly, it noted that nothing about the maintenance and cure context altered the foregoing observations.  *Id.* at 412.  The Court concluded from these principles that "respondent is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common-law understanding."  *Id.* at 415.  After reviewing the Jones Act, 46 U.S. § 30104, "[t]he only statute that could serve as a basis for overturning the common-law rule in this case," *id.*, the Court concluded that Congress had not precluded such claims for punitive damages, *id.* at 424.

Here, a similar analysis demonstrates that Plaintiffs may be permitted to recover for loss of consortium and punitive damages.  *First*, as set forth in

45

extensive detail in *Morgan* v. *Almars Outboards, Inc.*, claims for both punitive

damages and loss of consortium have been historically available under general

maritime law.  316 F. Supp. 3d 828, 840-42 (D. Del. 2018); *see also Robertson*

v. *Hynson*, No. 18 Civ. 13391 (RBK) (AMD), 2021 WL 3206784, at *3 (D.N.J.

July 29, 2021) (agreeing with the "District of Delaware's well-reasoned opinion

in *Morgan*" and denying summary judgment on claim for loss of consortium

under maritime law).  *Second*, GE has not identified any congressional

enactment that would preclude Plaintiffs from recovering such damages.  To

the contrary, GE relies in decisions finding loss of consortium or punitive

damages to be precluded by the Jones Act.  *See, e.g.*, *Sebright*, 525 F. Supp. 3d

at 251 (relying on the Supreme Court's decision in *Miles* v. *Apex Marine Corp.*,

498 U.S. 19 (1990), which held "that loss of consortium claims are precluded in

personal injury actions by Jones Act seaman").  Because Plaintiffs' civilian

claims are not brought under the Jones Act and in no way relate to maritime

commerce, these cases are inapposite.  *See Matter of Buchanan Marine, L.P.*,

874 F.3d 356, 365 (2d Cir. 2017) (observing that the Jones Act "gives seamen

an express right of action in tort because of their status as wards of the

admiralty who are by the peculiarity of their lives liable to sudden sickness

from change of climate, exposure to perils, and exhausting labour" (internal

quotation marks omitted)); *see also Morgan*, 316 F. Supp. 3d at 842 (noting

that "the vast majority of cases applying the Jones Act arise in the employment

context — in cases brought by seamen").  Accordingly, the Court denies GE's

motion as to these claims.

## CONCLUSION

For the foregoing reasons, the Court DENIES GE's motion to preclude Dr. Candace Su-Jung Tsai's testimony and DENIES AS MOOT its motion to preclude Captain Francis J. Burger's testimony.  Additionally, the Court GRANTS IN PART and DENIES IN PART GE's motion for summary judgment. The Court finds no triable issues with respect to Plaintiffs' claims for defective design and manufacture under negligence or strict liability theories or failure to warn arising from Plaintiff's service in the U.S. Navy and therefore GRANTS summary judgment as to these claims.  By contrast, the Court finds there to be genuine disputes of material fact with respect to Plaintiffs' defective design and manufacture and failure to warn claims arising from Plaintiff's work as a civilian electrician and therefore DENIES summary judgment as to these claims.

The parties are directed to file a joint status letter concerning proposed next steps in this case on or before **April 27, 2022**.

The Clerk of Court is directed to terminate the motions at docket entries 90, 93, and 110.

SO ORDERED.

Dated:      March 28, 2022
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

47